# IN THE SUPREME COURT OF TEXAS

═══════════

No. 16-0125

═══════════

DEBRA C. GUNN, M.D., OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, P.A.,
AND OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, P.L.L.C., PETITIONERS,

v.

ANDRE MCCOY, AS PERMANENT GUARDIAN OF SHANNON MILES MCCOY,
AN INCAPACITATED PERSON, RESPONDENT

═══════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

═══════════════════════════════════════════

**Argued February 8, 2018**

JUSTICE GREEN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE LEHRMANN, JUSTICE DEVINE, JUSTICE BROWN, and JUSTICE BLACKLOCK joined.

JUSTICE JOHNSON filed a dissenting opinion, in which JUSTICE BOYD joined.

JUSTICE GUZMAN did not participate in the decision.

This is a medical-malpractice case involving multiple issues. Shannon McCoy (Shannon) was thirty-seven weeks pregnant and under the prenatal obstetrical care of Dr. Debra Gunn, an obstetrician and gynecologist (ob/gyn) associated with Obstetrical and Gynecological Associates, P.A. (OGA). Shannon presented herself to the hospital with severe abdominal pain, where doctors determined that she had suffered placental abruption and that her fetus was not viable. Both during

and after delivery, Shannon experienced complications that led to brain damage, quadriplegia, and later, her death. Acting as her guardian, Shannon's husband, Andre McCoy (McCoy), sued the hospital and several attending doctors, including Dr. Debra Gunn, and their medical practice groups, including OGA.

The following issues are before us: (1) whether the court of appeals erred in holding that there was legally sufficient evidence of causation; (2) whether the trial court committed reversible error in excluding deposition testimony of the defendants' expert witness regarding future medical expenses; (3) whether the medical billing affidavits providing proof of past medical expenses were proper under Texas Civil Practice and Remedies Code section 18.001; (4) whether the trial court erred in refusing to instruct the jury on unavoidable accident; (5) whether the trial court erred in granting McCoy's no-evidence summary judgment as to the defendants' affirmative defense of comparative responsibility; (6) whether OGA's indemnity claims were properly asserted post-verdict; and (7) whether Shannon's death on the eve of the court of appeals' decision created a windfall for McCoy that calls for a remand in the interest of justice.

We agree with the court of appeals' holdings that the evidence of causation was legally sufficient, that the affidavits submitted by McCoy were proper under section 18.001, that the trial court did not commit reversible error in refusing the requested instruction on unavoidable accident, and that OGA's indemnity claim against Dr. Gunn was properly asserted. We hold that the trial court erred in excluding the video deposition testimony of the defendants' expert witness; however, the error did not probably cause the rendition of an improper judgment. We reject Dr. Gunn's argument that Shannon's death created a windfall for McCoy, and we hold that Dr. Gunn waived

2

her argument with regard to the trial court's summary judgment on comparative responsibility. Therefore, we affirm the judgment of the court of appeals.

## I. Background

Shannon McCoy was thirty-five years old and pregnant with her first child. Dr. Gunn, an ob/gyn associated with OGA, provided prenatal and obstetrical care to Shannon. Shannon first saw Dr. Gunn in March 2004, when she was estimated to be roughly nine weeks into her pregnancy. Her pregnancy was generally uneventful until September 13, 2004, when she was thirty-seven weeks into her pregnancy. On that morning, Shannon went to a routine prenatal visit with Dr. Gunn and everything appeared normal. Dr. Gunn ordered lab tests as a precautionary measure to check for hypertension; the lab results indicated that Shannon's hemoglobin level was 9.5.[1] That evening, Shannon presented to the Woman's Hospital of Texas with severe abdominal pain. She was admitted at 8:50 p.m., and Dr. Mark Jacobs, the ob/gyn on call, ordered an ultrasound and discovered that the fetus had died due to placental abruption, a condition in which the placenta detaches from the uterine wall. Dr. Jacobs ordered lab tests, which indicated that Shannon had developed disseminated intravascular coagulation (DIC), a blood-clotting disorder which causes both abnormal blood clotting throughout the body and profuse bleeding. DIC can occur for multiple reasons, including placental abruption. There is no dispute that in Shannon's case, DIC was not the fault of any party.

---

[1] Hemoglobin levels measure the concentration of hemoglobin in the bloodstream. According to McCoy's expert, they can be used as an indicator of blood loss.

3

Dr. Jacobs consulted with Dr. Brian Kirshon, a maternal/fetal medicine specialist, and the two doctors ordered a blood-product replacement plan to counter Shannon's DIC. Exactly how much blood Shannon lost and how much she received in the following hours—and how much she should have received—are heavily disputed. Some of this dispute stems from confusion in terminology between the parties and the court of appeals with respect to "blood" and "blood products." At no point did Shannon receive transfusions of whole "blood." Instead, it is undisputed that Shannon received the following components of blood, or "blood products": (1) packed red blood cells, which carry oxygen via hemoglobin to the body's organs; (2) fresh frozen plasma (FFP), which contains factors that promote the clotting process; and (3) platelets, which are cell fragments that also promote the clotting process. Once separated from whole blood, the blood products are diluted with intravenous (IV) fluid before they are transferred to the patient. Dr. Kirshon recommended that Shannon receive two units of FFP and two units of packed red blood cells "in light of the DIC." On Dr. Jacobs' order, FFP was given at 3:07 a.m. and 3:21 a.m., and the packed red blood cells were given at 3:56 a.m. and 4:50 a.m. Dr. Kirshon included the following recommendation: "I would have more blood products available and be on the look out for major postpartum hemorrhage."

Dr. Gunn arrived at the hospital around 4:00 a.m. on September 14 and assumed care of Shannon. Dr. Gunn consulted with Dr. Kirshon, and they agreed that vaginal delivery was necessary because of Shannon's DIC. They hoped, as is often the case with placental abruption and DIC, that the DIC would self-correct after delivery. Shannon delivered a stillborn baby girl at 6:20 a.m. Nurses documented a verbal order from Dr. Gunn at 7:20 to give Shannon two more units of packed red blood cells and to draw blood for lab tests. The lab results indicated that Shannon had

4

experienced significant blood loss, as measured by her hemoglobin level, and that her blood was not clotting normally. Specifically, the lab results indicated that Shannon's hemoglobin level had dropped to 5.5, as compared to the lab results from Shannon's prenatal visit the day before, when her hemoglobin level was 9.5. According to McCoy's expert, "for every one point that the hemoglobin goes down, that's approximately equal to one unit of blood" lost. The use of hemoglobin as an indicator of blood volume, however, is disputed by Dr. Gunn. Nurses documented a verbal order from Dr. Gunn at 9:00 a.m. to give Shannon four units of platelets, and another verbal order at 10:15 a.m. to give an additional two units of packed red blood cells, for a total of six units of packed red blood cells. No additional FFP was given to Shannon after the two units ordered by Dr. Jacobs. At 10:50 a.m., the nurses reported a decrease in urine output, and Dr. Gunn ordered that Shannon be given Lasix, a diuretic.

Shortly after 11:00 a.m., Shannon's condition was considered stable and post-labor bleeding appeared to have lessened, so Dr. Gunn authorized her transfer to the intensive care unit (ICU). At 12:00 p.m., nurses documented that Shannon's uterus was "boggy" and that she received uterine massage to induce firmness. Nurses documented a "large amount of bleeding and clots." At 12:10 p.m., Shannon's temperature increased and her heart rate accelerated to over 200 beats per minute. Dr. James Collins, a cardiologist who was covering the ICU, ran an electrocardiogram (EKG) and concluded that Shannon was experiencing paroxysmal atrial tachycardia, or elevated heart rate. Dr. Collins administered Digoxin to lower her heart rate, and Dr. Gunn ordered that Shannon receive uterine massage every fifteen minutes to encourage the uterus to contract. At that time, Shannon was responsive, and her blood pressure and oxygen saturation—the amount of blood that

5

is saturated with oxygen (95–99% for most people)—were both within normal limits. Her heart rate slowed to an appropriate rate after a second dose of Digoxin.

At 12:45 p.m., Shannon's uterus remained boggy upon uterine massage and nurses documented another "large amount [of] bleeding and clots." Around 1:00 p.m., nurses reported that Shannon's blood pressure had dropped to 106 over 60, that she was "agitated," and that her oxygen saturation rate was down to 72%. Lab tests ordered at 1:16 p.m. revealed that Shannon's hemoglobin levels had increased to 7.5, but her prothrombin time (PT), which measures whether blood is clotting properly, was outside the normal range. The normal PT range is 10.8 to 13.5 seconds; Shannon's was 18.2 seconds. Moreover, her creatinine levels had increased from 1.1 to 1.9, indicating that her kidneys were not receiving adequate blood flow. Nurses documented at 1:15 p.m., and again at 1:30 p.m., that Shannon "cont[inued] to bleed [a] mod[erate] amount." Dr. Gunn consulted with Dr. Kirshon, and they agreed that Shannon had been given the maximum amount of contractile drugs. They concluded that she had developed uterine atony, a loss of muscle tone in the uterus that prevents it from contracting and clamping down, resulting in excessive blood loss. She was experiencing significant obstetric hemorrhage. Dr. Gunn arranged for a hysterectomy to remove Shannon's failing uterus and ordered a blood emergency, alerting the blood bank "to prepare every unit [of blood products] that could be used with Shannon."

As the doctors moved Shannon from the ICU to the operating room, she was responsive, but she continued to hemorrhage. According to the operative report, "[t]he ICU bed had blood throughout from the head of the bed to the foot." Dr. Gunn continued to massage Shannon's uterus even after Shannon was moved to the operating table. Immediately after anesthesia was given,

6

Shannon went into ventricular fibrillation, where her heart was unable to pump blood. The anesthesiologists present performed CPR for seven minutes and delivered Shannon oxygen through a breathing tube. Her hemoglobin level at that time had dropped to 4.0, "evidence of uterine atony associated with the rapid loss of blood." Once Shannon was stabilized with blood products infusing, Dr. Gunn performed the hysterectomy.

Later that evening, in the ICU, Shannon experienced seizure activity. A neurology consult was called, and the neurologist concluded that this activity was probably a sign of hypoxic encephalopathy, or decreased oxygen to the brain. An electroencephalogram (EEG) was ordered, and the results were consistent with "severe depression of cerebral function, most probably an anoxic basis at least in part."[2] Shannon's blood gases showed that she was acidotic, meaning she had a dangerously low pH resulting from a lack of oxygen. Shannon was transferred to the neurological ICU at St. Luke's Hospital. She received months of rehabilitative treatment at St. Luke's, Select Specialty Hospital, and The Institute for Rehabilitation and Research. Her condition after the initial injury was assessed as a "persistent state of vegetation." Her husband testified to carrying out his wife's daily routine of personal hygiene, grooming, and dressing in the months and years after the injury. Simply put, she required twenty-four-hour care and remained "total[ly] dependent for all basic and higher level activities of daily living." The record suggests that Shannon initially experienced some improvement, including visual tracking, limited controlled movements, and producing words. However, in 2005—roughly a year after the initial injury—Shannon was

---

[2] "Hypoxia" refers to low oxygen; "anoxia" refers to no oxygen.

7

hospitalized for a seizure which resulted in an episode of hypoxia, and she never recovered her previous improvement.[3]

McCoy, acting individually and as Shannon's guardian, sued Woman's Hospital, Dr. Gunn, Dr. Jacobs, Dr. Collins, and OGA. Prior to trial, Dr. Collins was dropped from the pleadings, and Woman's Hospital and Dr. Jacobs each settled with McCoy for a total of $1,206,773.50. Dr. Gunn and OGA asserted the affirmative defense of comparative responsibility, claiming that McCoy, his family members, the treating labor-and-delivery nurses, and Dr. Collins were negligent and that their negligence contributed to Shannon's brain damage. McCoy filed a no-evidence motion for summary judgment on this affirmative defense, which the trial court granted. Testimony at trial was hotly disputed. Ultimately, the jury returned an eleven-to-one verdict in favor of McCoy as to Dr. Gunn's negligence and awarded $10,626,369.00 in damages. The award included $703,985.98 for past medical expenses and $7,242,403.00 for future medical expenses. The trial court applied a dollar-for-dollar settlement credit to offset the verdict in the amount of $1,206,773.50. The court ruled that OGA was vicariously liable for Dr. Gunn's negligence and ordered that the two defendants were jointly and severally liable.

The verdict spawned a series of new litigation tactics by McCoy, who joined a number of parties to the case after the verdict and delayed the entry of judgment for nearly two years. McCoy filed amended petitions adding new defendants to the case and seeking to collect the damages awarded in the verdict from them. Ultimately, the trial court granted summary judgment in favor of

---

[3] Dr. Martin Steiner, an expert witness who testified on behalf of Dr. Gunn and OGA, testified that this seizure event was unrelated to Shannon's initial injury. In 2007, Shannon suffered a massive stroke; Dr. Steiner testified that this too was unrelated to the events of 2004.

the new defendants and the court of appeals affirmed. *McCoy v. FemPartners, Inc.*, 484 S.W.3d 201, 214 (Tex. App.—Houston [14th Dist.] 2015, no pet.). OGA filed post-verdict claims for indemnity against Dr. Gunn and legal malpractice claims against its former defense counsel,[4] but later dismissed its legal malpractice claims. The trial court signed the final judgment in 2013, two years after the verdict was issued, and included an order that OGA was entitled to indemnity from Dr. Gunn.

Dr. Gunn and OGA appealed, raising several issues. Both argued that: (1) there was no evidence of causation; (2) the trial court should not have granted summary judgment on comparative responsibility; (3) the court should not have excluded Dr. Helen Schilling's testimony regarding Shannon's future medical expenses; (4) the court should have submitted various jury instructions; and (5) the evidence was legally and factually insufficient to support Shannon's past medical expenses. 489 S.W.3d 75, 83 (Tex. App.—Houston [14th Dist.] 2016, pet. granted). Dr. Gunn also argued that OGA's indemnity claim was not ripe. *Id.* The court of appeals held that the evidence was legally insufficient to support the full award of $7,242,403.00 for future medical expenses. *Id.* at 117. It suggested a voluntary remittitur of $159,854.00, which McCoy timely remitted. *Id.* The court of appeals overruled the remaining issues. *Id.* at 95, 101, 110, 117. Accordingly, it modified the trial court's judgment to reduce the award of future medical expenses to $7,082,549.00 and affirmed the judgment as modified. *Id.* at 117. Shannon continued to require around-the-clock care until her death

---

[4] OGA filed a motion to disqualify Dr. Gunn's lead trial counsel, Barbara Hilburn, based on its suit against Dr. Gunn for indemnity, which the trial court granted. *See In re Gunn*, No. 14–13–00566–CV, 2013 WL 5631241, at *1 (Tex. App.—Houston [14th Dist.] Oct. 15, 2013) (orig. proceeding) (mem. op.). Dr. Gunn sought and obtained mandamus relief from this disqualification order. *Id.* at *7.

on December 12, 2015, ten days before the court of appeals issued its original decision. We granted OGA's and Dr. Gunn's petitions for review. 61 Tex. Sup. Ct. J. 114 (Dec. 8, 2017).

## II. Causation

As their first issue, Dr. Gunn and OGA each argue that the evidence was legally insufficient to support the jury's finding that Dr. Gunn's alleged negligence caused Shannon's brain damage. In a legal sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Bustamante v. Ponte*, 529 S.W.3d 447, 455–56 (Tex. 2017); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). The record contains more than a mere scintilla of evidence when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *King Ranch, Inc.*, 118 S.W.3d at 751. Conversely, the record contains less than a scintilla when the evidence offered to prove a vital fact's existence is "so weak as to do no more than create a mere surmise or suspicion." *Id.* All the record evidence must be considered "in the light most favorable to the party in whose favor the verdict has been rendered," and "every reasonable inference deducible from the evidence is to be indulged in that party's favor." *Bustamante*, 529 S.W.3d at 456 (quoting *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

10

Recovery in a medical-malpractice case requires proof to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009). Proximate cause includes two components, cause-in-fact and foreseeability. *Id.* Proof that negligence was a cause-in-fact of the injury requires proof that (1) the negligence was a substantial factor in causing the injury, and (2) without the act or omission, the harm would not have occurred. *Id.* Thus, to satisfy a legal sufficiency review in such cases, plaintiffs must "adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Bustamante*, 529 S.W.3d at 456 (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010)). In medical-malpractice cases, the general rule is that "expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Jelinek*, 328 S.W.3d at 533.

The parties offer competing theories on causation. The court of appeals articulated McCoy's theory, which the jury apparently accepted:

> McCoy's causation theory is that Gunn failed to adequately treat Shannon's DIC by failing to order FFP to replace Shannon's clotting factors and slow her bleeding, and by failing to infuse enough units of blood. As Shannon continued to bleed, her body attempted various compensation mechanisms in an effort to maintain enough oxygen flow to avoid cardiovascular collapse and damage to her critical organs. However, Shannon continued to lose blood volume. As her blood volume loss approached the critical danger zone of approximately 40%, Shannon's body could no longer compensate, resulting in her cardiac arrest, lack of oxygen flow to her brain, and her permanent brain damage.

11

489 S.W.3d at 90. Dr. Gunn and OGA advanced a different theory—that Shannon's DIC caused small blood clots to form in Shannon's vascular system and some of those small clots lodged in blood vessels in Shannon's brain, resulting in her injuries. We summarize the evidence supporting the parties' arguments.

## A. McCoy's Theory

For the standard of care and Dr. Gunn's alleged failure to meet it, McCoy relied upon the testimony of Dr. Molly Brewer, a medical doctor board certified in both obstetrics and gynecology and gynecological oncology. Dr. Brewer underwent specific training in handling DIC patients, and she taught "how to handle DIC from placental abruption and other causes" to other ob/gyns.

Dr. Brewer testified that DIC impacts the body's ability to clot, which puts people at risk of bleeding because their clotting factors are no longer working properly. She stated that Shannon "absolutely" had DIC. Dr. Brewer estimated Shannon's blood volume based on her hemoglobin levels, explaining that "for every one point that the hemoglobin goes down, that's approximately equal to one unit of blood." She explained that doctors cannot always look at a patient and know if they are bleeding; therefore, doctors must rely on lab results, specifically hemoglobin levels, to approximate blood volume and blood loss.

Based on this underlying assumption, Dr. Brewer testified that the decreased hemoglobin levels shown in Shannon's lab results indicated that she was losing blood. Specifically, the lab tests ordered at 7:20 a.m. indicated that Shannon's hemoglobin levels had dropped from 9.5 to 5.5, which "should have put [Dr. Gunn] into almost panic mode." Dr. Brewer testified that by 1:00 p.m., Shannon had lost about 33 to 44% of her blood volume. Lab results also indicated that Shannon's

12

PT had increased, meaning that her blood was not clotting properly. Because DIC interfered with Shannon's body's clotting ability, Dr. Brewer stated that it was critical that she receive FFP and that Dr. Gunn breached the standard of care by failing to order or administer FFP in response to Shannon's lab results.

> [Y]ou can replace blood until the cows come home, but if you can't clot and you have an open wound like inside the uterus, they're going to continue to bleed. And so you basically put the blood in and the blood comes out, and without the clotting factors, you cannot control this coagulation disorder.

According to Dr. Brewer, a reasonable and prudent physician managing DIC should be making calculations based on hemoglobin levels to justify blood transfusions (e.g., "her hemoglobin went from x to y and therefore, we assume that she's lost two units, three units, four units, and then it's appropriate to replace it"). She testified that Dr. Gunn breached the standard of care by failing to do these calculations and, on a broader level, by failing to create and document a cohesive plan to manage Shannon's DIC.

Additionally, Dr. Brewer believed Shannon's lab results in the morning and the afternoon with respect to her other vital functions should have alerted Dr. Gunn that Shannon was losing blood due to her body's inability to clot. Dr. Brewer reported that Shannon's increased creatinine levels indicated that she had "acute renal failure," which, read in the context of DIC, tells us "[t]hat [she] probably doesn't have enough blood flow through [the] kidneys." She also pointed to Shannon's decreased oxygen saturation levels and her increased heart rate, describing these phenomena as compensation mechanisms to deal with low blood volume. "[I]f their blood is low, their heart rate goes up to get more blood. . . . If their oxygen is low, they breathe harder because it brings in more

13

oxygen. . . . [T]hey actually shunt blood away from their kidneys because they want to spare the heart and . . . the brain." Dr. Brewer stated that Shannon's low urine output was another sign of decreased blood flow to the kidneys, which should have been a warning sign. Instead of properly treating Shannon's low blood volume, Dr. Gunn administered Lasix, which is "for fluid overload" and probably made it worse for Shannon. She testified that a reasonable and prudent physician needs to stay equal with or ahead of blood loss in managing a patient like Shannon, and in this case, "Shannon was behind in her blood volume all the way along."

According to Dr. Brewer, Dr. Gunn's failure to replace Shannon's clotting factors by administering FFP contributed to her developing uterine atony. In the afternoon, Shannon became agitated. Dr. Brewer described this as one of the cardinal signs "that she's going into cardiovascular collapse. I mean, something terrible has happened. Patients get agitated when they don't get enough oxygen." When asked about Shannon's oxygen saturation level of 72%, Dr. Brewer responded, "I think it's a crisis." Dr. Brewer testified that after about 1:00 p.m., "the d[i]e was cast with reasonable certainty. I mean, they were in serious trouble. This woman was dying in front of their eyes. I mean, she had blood pouring out." In looking at the whole picture and at the blood loss, Dr. Brewer said it was foreseeable that Shannon would go into ventricular fibrillation. "The problem was [] she had lost so much blood at that point that it was a disaster."

Dr. Brewer stated that Shannon's lack of blood led to her ventricular fibrillation in the operating room. When a patient goes into ventricular fibrillation, her heart stops pumping blood and she is unable get oxygen to the brain. Shannon's EEG results indicated, "No focal or epileptic features are noted." Dr. Brewer testified that "the way that a reasonable person would interpret that

14

is that something had happened to all of the brain. . . . A global injury." At St. Luke's there were seventeen neurologic consults, and each neurologist agreed that Shannon had anoxic encephalopathy, which is global damage to the brain caused by a lack of oxygen.

Dr. Brewer offered the following conclusions: Dr. Gunn was negligent in failing to give more blood products from the beginning; Dr. Gunn was negligent in failing to order more frequent lab tests to determine whether the blood products needed to be adjusted; and Dr. Gunn was negligent in failing to include adjustments to the administration of blood products to deal with the hemoglobin, platelets, and lack of FFP. "You can [pour] the blood in, but the blood just keeps coming out if you can't clot it."

## B. Dr. Gunn and OGA's Theory

Dr. Gunn and OGA produced three experts on the issue of liability: Dr. James Aubuchon, a medical doctor, board certified in anatomic and clinical pathology, blood banking, and transfusion medicine; Dr. James Alexander, a medical doctor, board certified in obstetrics and gynecology with a subspecialty of maternal/fetal medicine; and Dr. Martin Steiner, a neurologist.

Contrary to Dr. Brewer's testimony, Dr. Aubuchon testified that with the blood products and fluids she had been given, Shannon had more than enough volume for her heart to function properly. He testified that her lab results (hemoglobin, creatinine, and PT), while outside of the normal ranges, were not "exceedingly high" or cause for panic. He also pointed to nurses' notes that recorded the presence of clots in the post-delivery vaginal bleeding, which "implies that the clotting system [was] able to work."

15

The three experts collectively offered an alternative theory of liability. They testified that placental abruption is a result of a rupture of the mother's blood vessels in the uterus. This leads to the exposure of a substance known as thromboplastin. Thromboplastin is intended normally to start a clotting process in a small area, but in the case of placental abruption, it gets into the blood system and kicks off the clotting system inside the blood vessels themselves. This process is effectively DIC: an activation of the clotting system, such that small clots, or "thrombi," are being formed throughout the entire body. These small clots move through the vascular system, and if they move into even smaller vessels, they may block those vessels, which is called "microthrombus." Such blockage would prevent blood flow to surrounding tissues, causing those tissues to die from lack of oxygen.

Dr. Steiner testified that Shannon's computerized axial tomography (CAT) scans after the injury were not consistent with a global hypoxic injury, but instead showed results focused in only a small area of the brain. Thus, he opined that "it's these microthrombi or these small little [clots] that we have been talking about" that cause the type of problems Shannon experienced. "It's not the type of thing that you see when there is a global hypoxia or a global lack of oxygen to the brain." He concluded that instead of a global or hypoxic event, Shannon suffered ischemia, or lack of blood flow to tissue, to small areas of her brain from these micro clots, and her neurological damage was "due to the small little microthrombi blocking off the blood vessels and causing teeny strokes." In support of this theory, he noted Shannon's initial improvement, which is typical in a patient who has mini strokes, but not in a patient who has suffered global problems of hypoxia to the brain. Thus, Dr. Steiner testified that Shannon's seizure in 2005, which he opined was unrelated to her initial brain

16

injury, was significant because Shannon never regained the improved function she initially experienced.

## C. Competency of Evidence

In analyzing whether there was legally sufficient evidence of causation, we start with the general proposition that "a determination of scientific reliability is appropriate in reviewing the legal sufficiency of evidence." *Merck & Co. v. Garza*, 347 S.W.3d 256, 262 (Tex. 2011).

> Justice Gonzalez, in writing for the Court, gave rather colorful examples of unreliable scientific evidence in *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995), when he said that even an expert with a degree should not be able to testify that the world is flat, that the moon is made of green cheese, or that the Earth is the center of the solar system. If for some reason such testimony were admitted in a trial without objection, would a reviewing court be obliged to accept it as some evidence? The answer is no.

*Havner*, 953 S.W.2d at 712. Examination of an expert's underlying methodology is "a task for the trial court in its role as gatekeeper, and [is] not an analysis that should be undertaken for the first time on appeal." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). However, we have long held that incompetent evidence is legally insufficient to support a judgment, even if admitted without objection. *City of Keller*, 168 S.W.3d at 812; *see also Coastal Transp. Co.*, 136 S.W.3d at 233 (holding that a legal sufficiency challenge may be brought on appeal even when there was no admissibility objection to the reliability of the expert's opinion; in that case, the challenge is limited to the face of the record, "for example, when the expert testimony is speculative or conclusory on its face"); *Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014) (noting that an expert opinion admitted without objection may be probative evidence even if its basis is unreliable, but such opinion offered with no

17

basis or with a basis that provides no support "is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection"). Thus, evidence showing an expert's opinion to be incompetent cannot be disregarded, even if the result is contrary to the verdict. *City of Keller*, 168 S.W.3d at 812. And if an expert's opinion is based on certain assumptions about the facts, we must consider evidence showing those assumptions were unfounded. *Id.* at 813; *see also Mel Acres Ranch*, 443 S.W.3d at 829 (explaining that reliance on insufficient data and unsupported assumptions, as well as analytical gaps, can render an expert's opinion conclusory and without any evidentiary value). Thus, "if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Mel Acres Ranch*, 443 S.W.3d at 829.

### 1. The Hemoglobin Test

Dr. Gunn challenges the underlying basis for Dr. Brewer's opinion—that one point on the hemoglobin test is equivalent to one unit of blood.[5] At trial, Dr. Aubuchon testified that a hemoglobin test measures the concentration of hemoglobin in the blood, but "[i]t doesn't by itself say anything about how much blood the patient has." He testified that hemoglobin levels are impacted by a patient's hydration status: "If you were given a lot of IV fluids, that would cause your hemoglobin level, your concentration of hemoglobins, to go down." Thus, when Shannon's

---

[5] The court of appeals did not address this underlying assumption because Dr. Gunn and OGA did not raise it before that court. 489 S.W.3d at 86. However, the competency of the evidence supporting the verdict is fairly subsumed in the challenge to the legal sufficiency of the evidence. *See Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 455 (Tex. 2015) ("We liberally construe issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants.").

hemoglobin levels dropped to 5.5, he believed it was as a result of at least four liters of IV fluids she received prior to that. Moreover, Dr. Gunn argues that Dr. Brewer's testimony is contradictory because Shannon's lab results at 1:16 p.m. indicated that her hemoglobin levels had in fact increased from 5.5 to 7.5.

An expert's opinion may be considered unreliable if it is based on assumed facts that vary materially from the actual facts, or if it is based on tests or data that do not support the conclusions reached. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009); *see Mel Acres Ranch*, 443 S.W.3d at 833. In either instance, the opinion is not probative evidence. *Camacho*, 298 S.W.3d at 637. However, this does not mean that an expert's factual assumptions must be uncontested or established as a matter of law—if the evidence conflicts, it is normally the province of the jury to determine which evidence to credit. *Mel Acres Ranch*, 443 S.W.3d at 833. But if the record contains no evidence supporting an expert's material factual assumptions, or if such assumptions are contrary to conclusively proven facts, opinion testimony founded on those assumptions is not competent evidence. *Id.* Expert testimony may also be unreliable if "there is simply too great an analytical gap between the data [relied upon] and the opinion proffered." *Id.* at 835 (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)). We are not required to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect, and such a flaw in an expert's reasoning renders the scientific testimony "unreliable and, legally, no evidence." *Id.* (quoting *Havner*, 953 S.W.2d at 714).

In her testimony, Dr. Brewer first offered a basis for using hemoglobin as an indicator of blood loss:

Q: Now you hear about these blood tests like a CBC, a complete blood count. Is a hemoglobin included in the CBC?

A: It is. Usually, a hemoglobin, hematocrits. It looks at white blood cells, it look[s] at red cells . . . and it looks at platelet count.

Q: If a physician wants to know if his or her patient is bleeding, can they order a CBC and look at hemoglobin?

A: They can. They can also just order a hemoglobin and a hematocrit. They can do either.

She testified that using lab results, including hemoglobin, to measure blood loss is necessary because doctors "[a]bsolutely" cannot always look at a patient and know if she is bleeding. And Dr. Brewer explained the inconsistency in Shannon's increased hemoglobin level in the afternoon.

Q: So what really was going on when the hemoglobin went from 5.5 at 7:27 in the morning to 7.5 at 1:16 in the afternoon, explain that to us please.

A: That she was continuing to bleed.

Q: And how do you know that?

A: Because from the amount that was put in, that she was infused, it should have been higher than that.

Finally, Dr. Brewer acknowledged that hemoglobin levels provide only an approximation of blood loss, repeatedly emphasizing on both direct and cross examinations that such levels must be viewed within the broader context of Shannon's condition.

Q: . . . But if [Shannon's hemoglobin] was 5.5, that fact alone with no other evidence, you would agree one would not expect a patient to have a cardiac arrest just by having a 5.5 hemoglobin. Correct?

A: I can't agree with what you're saying because you're taking things out of context.

Q: Let's do this as—let's don't use Shannon McCoy.

20

A: I don't think you can say it about any patient. It has to be in the context of what's happening medically.

The court of appeals correctly noted that the jury was entitled to credit Dr. Brewer's testimony "that it is not 'appropriate' for someone managing a DIC case to consider just one lab result such as hemoglobin and ignore all the other markers, including the presence of quantifiable external bleeding." 489 S.W.3d at 93 (quoting Dr. Brewer's testimony). Thus, while the assumption underlying Dr. Brewer's opinion is not uncontested or established as a matter of law, it is also not unfounded or scientifically unreliable on the face of the record, and the jury was free to credit both the assumption and the opinion resting on it. *City of Keller*, 168 S.W.3d at 827 (holding that a reviewing court "must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not").

## 2. The Quantity of Blood Products Transfused

Applying Dr. Brewer's hemoglobin assumption, the court of appeals conducted detailed calculations of Shannon's blood loss based on the evidence in the record, reaching the following conclusions:

> Utilizing the initial blood volume figure of 20.1 units cited by Gunn and OGA, the jury reasonably could have concluded that Shannon's blood volume loss reached approximately 36% by 1:00 p.m. in reliance on these figures:
>
> - 20.1 units of blood present in Shannon's body at 11:00 a.m. on September 13 minus 13.2 units of blood lost plus 6 units of blood replaced equals 12.9 units of blood present at 1:00 p.m. on September 14.
>
> - 20.1 units of blood present in Shannon's body at 11:00 a.m. on Septmeber 13 minus 12.9 units of blood present at 1:00 p.m. on September 14 equals a net blood loss of 7.2 units during that interval.

21

- A net blood loss of 7.2 units as of 1:00 p.m. on September 14 divided by 20.1 units of blood present at 11:00 a.m. on September 13 equals 36% of blood volume loss during that interval.

This percentage falls squarely within Brewer's estimated blood volume loss range of 33% to 44%, and approaches the critical danger zone where it is undisputed on this record that cardiac arrest is a reasonable medical probability.

489 S.W.3d at 91–92. Dr. Gunn and OGA each argue that the court of appeals' assertion that Shannon received only "6 units of blood" is contrary to the record, and that prior to 1:00 p.m., she actually received at least 12 units of blood products. *See id.* at 92. This inconsistency reflects the confusion between "blood" and "blood products," implicating a quality-versus-quantity debate that persisted during oral argument before this Court. The court of appeals, relying on Dr. Brewer's hemoglobin assumption, included only the transfusions of packed red blood cells in its reference to "blood," *see id.*, while Dr. Gunn and OGA's calculation of "12 units of blood products" includes the two units of FFP and the four units of platelets that were administered in addition to the packed red blood cells. Dr. Brewer's theory operates under the apparent assumption that blood volume is primarily increased by transfusions of packed red blood cells, whereas transfusions of FFP and platelets have less effect on volume, but instead are administered to promote the clotting process.[6] Again, here, it is the province of the jury to determine which evidence to credit, *Mel Acres Ranch*,

---

[6] Dr. Gunn suggests that medical expertise is required to properly understand the medical records, and argues that "speculative expert testimony may not be supplemented by the analyses of reviewing courts, which are unqualified to review medical records and render medical opinions." We remind the parties that neither the court of appeals nor this Court is composed of medical experts, and the vast majority of jurors are not doctors. And our review is confined to the record before us. *E.g.*, *Mel Acres Ranch*, 443 S.W.3d at 833 ("[I]f the record contains no evidence supporting an expert's material factual assumptions, or if such assumptions are contrary to conclusively proven facts, opinion testimony founded on those assumptions is not competent evidence."); *Monsanto Co. v. Davis*, 25 S.W.3d 773, 781 (Tex. App.—Waco 2000, pet. dism'd w.o.j.). Our justice system empowers jurors to listen to competing expert testimony and determine which evidence to credit. *Mel Acres Ranch*, 443 S.W.3d at 833. In reviewing the jury's verdict, a reviewing court may not impose its own contrary opinion. *City of Keller*, 168 S.W.3d at 819. Instead, we consider only whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review. *Id.* at 827.

443 S.W.3d at 833, and we review evidence and inferences in the light most favorable to the jury's findings. *Bustamante*, 529 S.W.3d at 456.

## D. Superiority Requirement

To avoid being conclusory, an expert must, to a reasonable degree of medical probability, explain how and why the negligence caused the injury. *Jelinek*, 328 S.W.3d at 536. Importantly, when the evidence demonstrates that "there are other *plausible* causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty." *Bustamante*, 529 S.W.3d at 456 (quoting *Havner*, 953 S.W.2d at 720) (no emphasis in original). Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion. *Jelinek*, 328 S.W.3d at 536. OGA asserts that the record contains no evidence that Dr. Brewer's blood-loss theory was superior to Dr. Aubuchon, Dr. Alexander, and Dr. Steiner's DIC/blood-clot theory. We disagree.

McCoy's counsel addressed *Jelinek*'s superiority requirement head-on, asking Dr. Brewer directly to explain why her theory was medically superior to the theory advanced by the defense experts.[7] In response, Dr. Brewer talked at length about what she perceived as gaps in Dr. Alexander's and Dr. Steiner's testimony. She also explained that Shannon's EEG was consistent with a global brain injury because it lacked the focal features that would be consistent with mini

---

[7] Indeed, McCoy's counsel phrased his question with language lifted directly out of *Jelinek*, which was new at the time of the trial.

strokes to a specific area of the brain. This conclusion was consistent with the unanimous opinions of the seventeen neurologists who assessed and treated Shannon in the months following her injury.[8] Dr. Brewer testified that the microthrombi study relied on by Dr. Steiner was invalid as applied to Shannon because it involved a patient population that already had brain damage, and thus was too dissimilar from Shannon to provide a useful comparison. And she testified that Shannon's lack of clotting based on her lab results rendered the defense's microthrombi theory "highly unlikely." Based on the record, Dr. Brewer's testimony more than satisfied *Jelinek*'s superiority requirement. *See id.*

Like many medical-malpractice cases, this case involved a battle of the experts. *See, e.g.*, *id.* at 533. In such cases, jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. It is the province of the jury to resolve conflicts in the evidence, and when reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict. *Id.* at 820. The jury in this case heard conflicting expert opinions and it reasonably could have believed Dr. Brewer's testimony in light of the evidence. *Id.*; *see also Mel Acres Ranch*, 443 S.W.3d at 833. We agree with the court of appeals that the evidence is legally sufficient to support a finding of proximate cause.

### III. Shannon's Future Medical Expenses

Both Dr. Gunn and OGA assert that the trial court erred in refusing to admit video deposition testimony of Dr. Helen Schilling, which Dr. Gunn and OGA offered to controvert McCoy's evidence

---

[8] The record indicates that more than twenty neurological assessments performed on Shannon between September 2004 and October 2004 documented that Shannon had anoxic encephalopathy, ischemic encephalopathy, and a hypoxic event.

24

of the cost of future medical expenses.[9] We review a trial court's exclusion of an expert witness's testimony for an abuse of discretion. *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016). A trial court abuses its discretion by failing to follow guiding rules and principles. *Hawley*, 284 S.W.3d at 856. The court of appeals did not address the propriety of the decision to exclude Dr. Schilling's deposition testimony, concluding that even if its exclusion was in error, the error was harmless. 489 S.W.3d at 111. To reverse a trial court's judgment based on the exclusion of evidence, we must find that the trial court did in fact commit error, and that the error was harmful. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989).

We first assess whether Dr. Schilling's exclusion was in error and conclude that it was. At trial, McCoy presented evidence of future medical expenses through the testimony of Dr. Alex Willingham. When Dr. Gunn and OGA sought to present video deposition testimony from their own damages expert, Dr. Schilling, McCoy objected on the ground that the video cuts at issue did not contain the predicate to establish Dr. Schilling's qualifications as an expert witness. The trial court agreed and refused to allow the video deposition cuts on their own, but it acknowledged that Dr. Schilling could testify live at trial to establish the basis for her expertise. Dr. Gunn and OGA chose not to call Dr. Schilling as a live witness, but presented an offer of proof instead.

To testify as an expert, a witness must be qualified, and the proposed testimony must be relevant to the issues in the case and based upon a reliable foundation. TEX. R. EVID. 702; *Robinson*, 923 S.W.2d at 556. Therefore, to be admissible, the specific video cuts at issue needed to contain

---

[9] McCoy asserts that the trial court did not exclude Dr. Schilling as a witness, but rather excluded only her video testimony as lacking the proper foundation, and would have allowed her to testify live. Because we hold that the trial court erred, we do not address McCoy's proposed distinction.

Dr. Schilling's qualifications. If a court ruling excludes evidence, a party must preserve error by filing an offer of proof informing the court of the substance of the excluded evidence. TEX. R. EVID. 103. Dr. Gunn and OGA's offer of proof shows that Dr. Schilling's deposition provides adequate testimony as to her qualifications, including details about her background in physical medicine and rehabilitation, her experience teaching residents in that field, her experience as a director of rehabilitation at a hospital, her experience preparing life-care plans as part of her daily practice, and her own examination of Shannon.[10] Based on the offer of proof, which references the transcript of the excluded testimony, Dr. Schilling's qualifications are not dissimilar from those of Dr. Willingham, whose testimony was admitted without objection. Both doctors completed a physical medicine and rehabilitation residency, served as medical directors at rehabilitation centers, are on a faculty teaching physical medicine and rehabilitation residents, and prepare life-care plans as part of their practices. Of course, without the specific video cuts in the record, we cannot determine with absolute certainty that the qualifications provided in the offer of proof (Dr. Schilling's deposition) were actually contained in the proffered testimony. To be clear, an offer of proof is not a work-around for the foundational requirement that an expert's qualifications be proven, and it is limited to the substance of the excluded evidence. *See* TEX. R. EVID. 103. However, based on the record before us, we are satisfied that the defense offered testimony of an expert witness whose qualifications were established. We have no reason to believe that the defense

---

[10] We have recently held that video depositions generally do not need to viewed by the court before ruling on objections, as do other videos offered as evidence. *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 546 (Tex. 2018). In this case, Dr. Schilling's deposition transcript was already before the court, having been filed with an untimely *Robinson* challenge.

26

excluded its own expert witness's qualifications from the video cuts offered,[11] nor can we conclude from the record before us that the qualifications discussed in the defense's offer of proof were in fact excluded from the video cuts that it intended to show the jury.[12]

Litigants in Texas are afforded a broad right to make strategic decisions when introducing evidence at trial, and they are entitled to present experts in a manner of their choosing, so long as it is consistent with the Texas Rules of Civil Procedure and the Texas Rules of Evidence. *E.g.*, *Jones v. Colley*, 820 S.W.2d 863, 866 (Tex. App.—Texarkana 1991, writ denied) ("A party, as a matter of trial strategy, is entitled to present his evidence in the order he believes constitutes the most effective presentation of his case, provided that it does not convey a *distinctly false impression*."). Our rules make deposition testimony admissible without regard to the party's availability to appear live. TEX. R. CIV. P. 203.6(b) ("All or part of a deposition may be used for any purpose in the same proceeding in which it was taken."); TEX. R. EVID. 801(e)(3) (indicating that a deponent's statement is not hearsay and "[t]he deponent's unavailability as a witness is not a requirement for admissibility"). Texas Rule of Civil Procedure 203.6 allows any part of a deposition to be presented in evidence, and no rule requires that the deposition be entered in its entirety. TEX. R. CIV. P. 203.6(b). On the contrary, the rule of optional completeness offers the adverse party a remedy if their sole objection to the deposition testimony is its completeness. TEX. R. EVID. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may introduce, at

---

[11] In response to McCoy's objection to the testimony's lack of foundation, OGA's counsel responded, "[Y]ou asked for a foundation, and it is stated in here *in the cuts that we have*." (Emphasis added).

[12] At oral argument, McCoy's counsel contended that he intentionally did not ask questions regarding Dr. Schilling's qualifications so that her deposition could not be used at trial. But the transcript and the fact that the entire deposition was videotaped suggest otherwise.

that time, any other part . . . that in fairness ought to be considered at the same time. 'Writing or recorded statement' includes depositions."); *Jones*, 820 S.W.2d at 866. OGA's attorney indicated at the time of the objection that Dr. Schilling's qualifications were contained in the proffered video cuts, and considering the deposition transcript, we see no reason to doubt that representation. Moreover, Dr. Schilling's qualifications were established in Dr. Gunn and OGA's offer of proof, referencing page and line numbers of the same deposition testimony they sought to present by video.

Accordingly, we hold that the trial court abused its discretion in excluding Dr. Schilling's testimony.

We next consider whether the exclusion of this evidence was harmful.[13] Texas Rule of Appellate Procedure 61.1 recites our reversible error standard—under that standard, we may reverse the court of appeals' judgment only if the trial court's erroneous exclusion of evidence "probably caused the rendition of an improper judgment." TEX. R. APP. P. 61.1; *see also Gee*, 765 S.W.2d at 396. In application, a judgment may not be reversed unless the error "can be said to have contributed in a substantial way to bring about the adverse judgment." *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 819–20 (Tex. 1980) (citing *King v. Skelly*, 452 S.W.2d 691, 696 (Tex. 1970)). This rule is based on our understanding that "a litigant is not entitled to a perfect trial for, indeed, few trials are perfect." *Id.* at 819. The determination of whether the error probably caused the rendition of an improper judgment "necessarily is a judgment call entrusted to the sound

---

[13] The court of appeals concluded that if there was error, the error was harmless based on (1) the fact that the jury heard about Dr. Schilling's cost projections from McCoy's expert witness, Dr. Willingham; (2) the court's view that the "key dispute" in the case was over liability, not damages, meaning that the judgment did not turn on Dr. Schilling's testimony; and (3) the court's determination that the error in excluding the testimony was minor, if it was error at all, because both experts agreed that Shannon's future medical expenses would likely be millions of dollars. 489 S.W.3d at 111–12.

28

discretion and good senses of the reviewing court," *McCraw v. Maris*, 828 S.W.2d 756, 759 (Tex. 1992), and we have recognized "the impossibility of establishing a specific test for determining harmful error." *Caffe Ribs, Inc.*, 487 S.W.3d at 145 (citing *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009)); *see also Lorusso*, 603 S.W.2d at 821 (citing *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835 (Tex. 1979)).

We have, however, noted that the role excluded evidence plays in the context of trial is important, and we have provided guidelines to assist trial courts in applying the reversible error standard. *See Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. Exclusion is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Id.* By contrast, exclusion of the evidence is likely harmful if it was "crucial to a key issue." *Id.* We do not dispute that future medical expenses, which made up almost 70% of the trial court's judgment, was indeed a "key issue." But that does not end the inquiry; our guidelines make clear that even if the exclusion of evidence is crucial to a key issue, it is "*likely* harmful," not conclusively or per se harmful. *See id.* (emphasis added). And our guidelines do not displace the standard—otherwise the standard would become meaningless for entire categories of error. *See In re D.I.B.*, 988 S.W.2d 753, 759 (Tex. 1999) ("[A]ppellate courts should not automatically foreclose the application of the harmless error test to certain categories of error." (quoting *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997))); *Walker v. Tex. Emp'rs' Ins. Ass'n*, 291 S.W.2d 298, 301 (Tex. 1956) ("Reversal may not be predicated upon a simple showing that error occurred and that the jury returned a verdict in some respects favorable to the party the error was reasonably calculated to help. If it could, the further provision of [the predecessor to

29

Rule 61.1] that it must also appear that the error 'probably did cause the rendition of an improper judgment' would be meaningless and pointless."). Thus, in determining whether the exclusion of evidence was harmful, we must review the entire record, *Tex. Dept. of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000), and we apply the same standard—whether the erroneous exclusion of evidence probably caused the rendition of an improper judgment—even when the excluded evidence related to a key issue. *Caffe Ribs, Inc.*, 487 S.W.3d at 144–45; *Gee*, 765 S.W.2d at 396.

The dissent manipulates the language we have used in analyzing whether error is harmful by omitting the word "likely" from our guidelines and introducing a two-part "framework" under which an error "is considered to have caused rendition of an improper judgment . . . if the excluded testimony was crucial to a key issue, *provided* that the excluded evidence was not merely cumulative and that the other evidence was not so one-sided that the excluded evidence likely would have made no difference." ___ S.W.3d at ___. However, we have never endorsed this standard and have in fact noted that establishing a bright-line rule—as the dissent proposes to do—is impossible. *Caffe Ribs, Inc.*, 487 S.W.3d at 145; *see also Lorusso*, 603 S.W.2d at 821 ("We recognize the impossibility of prescribing a specific test for determining whether any error . . . did cause the rendition of an improper judgment. Such a determination necessarily is a judgment call entrusted to the sound discretion and good senses of the reviewing court.") (internal quotations omitted). Our standard does not require that a complaining party show that evidence was not cumulative, not so one-sided, or even crucial to a key issue. "The complaining party must *only* show that the exclusion of evidence probably resulted in rendition of an improper judgment." *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 869 (internal quotations omitted).

30

Dr. Gunn and OGA explained to the trial court that Dr. Schilling's video deposition testimony revolved around her line-item annotations to the life-care plan that Dr. Willingham had prepared, and in their offer of proof, they tendered Dr. Schilling's marked-up copy of Dr. Willingham's life-care plan for Shannon to be admitted into the record.[14] Dr. Gunn and OGA argued that the excluded video testimony indicated that Dr. Schilling believed some items in Dr. Willingham's life-care plan were not reasonably necessary, and that Dr. Schilling believed some items in that life-care plan related to Shannon's subsequent conditions (her seizure and hypoxia in 2005) and thus were unrelated to Dr. Gunn's alleged negligence.

Dr. Willingham's life-care plan projected future medical expenses for two care options, one for home care (Option 1) and one for facility-based care (Option 2). The two options were clearly presented to the jury. Both plans accounted for a twenty-year life expectancy. Dr. Willingham's testimony enumerated a number of categories of expenses—physician services, therapeutic services, medication, diagnostics, and supported life care, among others. He explained in detail what each category entailed, and he discussed why the projected expenses for some categories were the same for Option 1 and Option 2 while others were different for the two options.[15] He testified that, in total, the projected future medical expenses were "just over $6.9 million" for Option 1 and "just over

[14] McCoy raised a hearsay objection to the admission of Dr. Schilling's testimony based on the marked-up copy of Dr. Willingham's life-care plan. Under the Texas Rules of Evidence, a statement made in a deposition taken in the same proceeding is an exclusion from hearsay, regardless of the deponent's availability as a witness. TEX. R. EVID. 801(e)(3).

[15] Dr. Willingham also included a category called "potential care needs," which he described as "possibilities but not likely to occur." The amount in this category was the same for both options. The court of appeals held that this category was not supported by legally sufficient evidence, suggested a voluntary remittitur in the amount projected for this category ($159,854.00), and ultimately affirmed the trial court's judgment as modified to reflect the remittitur. 489 S.W.3d at 113.

31

"$7.3 million" for Option 2.[16]  He then explained that Dr. Schilling had made annotations to his life-care plan, "getting rid of some items and reducing the frequency of some items and lowering the cost of some items."  He testified that implementing Dr. Schilling's changes and criticisms reduced the projected costs to $3.3 million for Option 1 and $6.7 million for Option 2.

Neither of the two witnesses' testimony purported to speak to liability, which the jury ultimately decided in favor of McCoy.  Therefore, although the exclusion of Dr. Schilling's video testimony was error, we are satisfied that the exclusion did not affect the jury's determination of liability.  Nor did it cause the rendition of an improper judgment with regard to awarding future medical expenses, since both experts conceded that Shannon would require several millions of dollars in future medical expenses.  And the parties do not dispute that the amount of Shannon's future medical expenses would be *at least* equal to Dr. Schilling's reduced projections for Option 1 and Option 2—a minimum of $3.3 million.  Thus, the only harm that could have resulted from the exclusion of Dr. Schilling's testimony was with respect to the amount of the award for future medical expenses that exceeded Dr. Schilling's minimum projection of $3.3 million.

Furthermore, neither Dr. Willingham's testimony nor Dr. Schilling's proffered video testimony attempted to persuade the jury that one option was preferable to the other.  On the contrary, Dr. Willingham specifically stated on cross examination that he was not making a judgment call as to which option was preferable: "Either venue is appropriate, either care remaining within the home with caregivers brought in or moving to a life care residential. Either venue is

---

[16] These values were reduced to present value and adjusted for inflation, bringing them to "just over $6.6 million" for Option 1 and "just over $7 million" for Option 2.

appropriate." Likewise, Dr. Schilling's excluded deposition testimony contains nothing that might have suggested to the jury that home care would have been preferable. The jury was presented with ample testimony to understand the nature of the two options and chose Option 2, facility-based care. Thus, the question is what effect, if any, the erroneous exclusion of Dr. Schilling's video testimony had on the amount of damages awarded under the Option 2 plan, and whether the exclusion probably caused the jury to improperly award future medical expenses in excess of her projection for that option, $6.7 million.[17]

Dr. Gunn and OGA do not challenge the legal sufficiency of the evidence supporting the jury's award of future medical expenses; therefore, that issue is not before us. We note that there is evidence to support Dr. Willingham's projected expenses, and the jury was presented with some evidence of Dr. Schilling's projections and criticisms. An award of future medical expenses is, by its very nature, not a matter of certainty. *See, e.g.*, *Gulf, C. & S.F. Ry. Co. v. Harriett*, 15 S.W. 556, 559 (Tex. 1891) ("[T]he evidence should show that there is a reasonable probability of the occurrence of future ill effects of the injury, and [] it need show no more in order to justify the jury in considering future consequences in estimating the damages."); *see also Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (explaining that, to recover future medical expenses, "the plaintiff must present evidence to establish that in all reasonable probability, future medical care will be required and the reasonable cost of that

---

[17] The jury's award was consistent with Dr. Willingham's recommendation for Option 2, reduced to present value (approximately $7.2 million), instead of the $6.7 million proposed by Dr. Schilling's Option 2 plan. However, the amount of the jury award was reduced further to approximately $7.1 million by the court of appeals' modified judgment, to account for damages that were not proven by sufficient evidence. 489 S.W.3d at 117. Thus, the amount of the harm, if there was any, is limited to roughly $400,000—the difference between the modified judgment and Dr. Schilling's proposed Option 2 amount.

33

care"). The fact that additional evidence might have led the jury to award a different amount of future medical expenses does not mean that the jury's award without that evidence was unsupportable or improper. *See Aultman v. Dallas Ry. & Terminal Co.*, 260 S.W.2d 596, 600 (Tex. 1953) (discussing the meaning of "probably" and recognizing that error can be harmless when it has no bearing on the issue of liability and could have influenced only the amount of damages, and the record contains ample support for the damages award). At the end of the day, we afford the jury discretion in awarding damages within the range of evidence presented at trial. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 713 (Tex. 2016) (explaining that when determining whether the jury had a sufficient evidentiary foundation on which to base its damages award, we limit our review to only the evidence tending to support the jury's damages award, unless contrary evidence is conclusive).

An error in excluding evidence is harmful when it "probably" caused the rendition of an improper judgment, and "probably" is a higher standard than "might" or "could have." *See Caffe Ribs, Inc.*, 487 S.W.3d at 144–45 (stating that a trial court's exclusion of evidence "is reversible only if it probably caused the rendition of an improper judgment"); *Aultman*, 260 S.W.2d at 600 (defining "probably" as "having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt; likely"). Of course, this standard does not require the complaining party to prove that "'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. But "likely" does not mean "definitively"—we must review the record to determine whether, in this particular case, the exclusion of Dr. Schilling's video deposition testimony "probably," as opposed to "might have"

34

or "could have," caused the rendition of an improper judgment. Having reviewed the entire record, we cannot say that the erroneous exclusion of Dr. Schilling's video deposition testimony probably caused the rendition of an improper judgment. Dr. Gunn and OGA have not shown the trial court's error to be harmful, and we therefore may not reverse on this basis. TEX. R. APP. P. 61.1.

This is, of course, not to say that a plaintiff can effectively preempt a defense expert's presentation of evidence or a witness by having one of the plaintiff's expert witnesses discuss the substance of the defense witness's testimony. That cannot be the case. We hold only that in this case, on the record before us, the exclusion of Dr. Schilling's testimony did not "probably cause the rendition of an improper judgment." *Id.*; *see Caffe Ribs, Inc.*, 487 S.W.3d at 144–45; *Gee*, 765 S.W.2d at 396.

### IV. Medical Billing Affidavits

As their second and third issues respectively, Dr. Gunn and OGA argue that McCoy failed to present legally sufficient evidence of Shannon's past medical expenses, for which the jury awarded $703,985.98. Specifically, they argue that the affidavits McCoy served did not comply with Texas Civil Practice and Remedies Code section 18.001 and therefore constituted no evidence, and in the absence of proper affidavits, McCoy failed to provide expert testimony regarding the reasonableness and necessity of the fees.

Section 18.001 governs proving expenses by affidavit. TEX. CIV. PRAC. & REM. CODE § 18.001. It is common to use section 18.001 affidavits as evidence of the reasonableness and necessity of past medical expenses. *See, e.g.*, *Haygood v. De Escabedo*, 356 S.W.3d 390, 397–99 (Tex. 2011). The statute provides:

35

> Unless a controverting affidavit is served as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.

TEX. CIV. PRAC. & REM. CODE § 18.001(b). To comply with this section, an affidavit must be made by "(A) the person who provided the service; or (B) the person in charge of records showing the service provided and the charge made." *Id.* § 18.001(c)(2). Consistent with other parts of the Code, the amount listed on the affidavit is limited to the amount actually paid or incurred, not the amount billed. *Haygood*, 356 S.W.3d at 390, 398 (citing TEX. CIV. PRAC. & REM. CODE § 41.0105). Generally speaking, section 18.001 is "purely procedural, providing for the use of affidavits to streamline proof of the reasonableness and necessity of medical expenses." *Id.* at 397. Thus, the affidavits are not conclusive; the statute expressly provides that they can be controverted by competing affidavit. TEX. CIV. PRAC. & REM. CODE § 18.001(b); *Haygood*, 356 S.W.3d at 397–98.

McCoy initially served fourteen section 18.001 affidavits from Shannon's medical providers or those providers' record custodians, containing the billed amounts. After this Court issued its opinion in *Haygood*, McCoy withdrew the provider affidavits and filed affidavits from subrogation agents for health insurance carriers that had paid Shannon's medical expenses, reflecting instead the amounts actually paid. Dr. Gunn and OGA objected, arguing that section 18.001 limits the proper affiants to providers or record custodians for those providers. We disagree.

Our primary goal in statutory construction is to give effect to the Legislature's intent. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). We rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by

36

legislative definition or is apparent from the context, or the plain meaning leads to absurd results. *Id.* We have already acknowledged that the Legislature's intent in enacting section 18.001 was "to streamline proof of the reasonableness and necessity of medical expenses." *Haygood*, 356 S.W.3d at 397. We further note that the plain language of section 18.001(c)(2)(B) does not require that affidavits be made by a records custodian *for a medical provider*. TEX. CIV. PRAC. & REM. CODE § 18.001(c)(2)(B); *see also Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012) ("[T]his Court presumes the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact."). Still, we recognize that an effort to "streamline" proof of the reasonableness and necessity of medical expenses cannot negate the requirement that reasonableness and necessity be in fact proven by legally sufficient evidence. *See Haygood*, 356 S.W.3d at 397–98. We therefore assess whether subrogation agents are in a position to testify to the reasonableness and necessity of medical expenses.

Health care costs today are complex, and the price of a particular provider's services may depend on many factors, including geography, experience, location, government payment methods, and the desire to make a profit. Keith T. Peters, *What Have We Here? The Need for Transparent Pricing and Quality Information in Health Care: Creation of an SEC for Health Care*, 10 J. HEALTH CARE L. & POL'Y 363, 366 (2007). Hospitals have developed a two-tier pricing system: (1) the "list price," which serves as a starting point for negotiations, similar to the sticker price one might find when purchasing a vehicle; and (2) the "actual price," which is what private insurers, Medicaid and Medicare, and other groups actually pay after negotiations. *Id.*; *Haygood*, 356 S.W.3d at 393.

37

While hospital prices ideally should be determined by the cost of providing care, in reality list prices are driven in large part by the reimbursement rates for federal programs such as Medicare and Medicaid, and by negotiations with private insurers. *Haygood*, 356 S.W.3d at 393 (citing Peters, *supra* at 366).

Although the list price of health care varies widely across different regions of the country, the actual price paid is relatively static. Peters, *supra* at 366. Thus, it is not uncommon or surprising that a given medical provider may have no basis for knowing what is a "reasonable" fee for a specific service. *See id.* at 364 (discussing the lack of transparency in health care pricing and detailing a personal account in which the business office of a hospital "did not know and had no list of typical charges" for the cost of delivering a child, a routine procedure). While hospitals may devote significant time and effort to establishing and updating their list prices, they generally establish those prices with the clear expectation that they will be paid only a portion of them. George A. Nation III, *Obscene Contracts: The Doctrine of Unconscionability and Hospital Billing of the Uninsured*, 94 KY. L.J. 101, 118 (2005). Thus, for most consumers today, the most important function of a health insurance company in a given year is not paying a portion of health care expenses, but negotiating the prices for those services with providers. Jackson Williams, *The Persistence of Opportunistic Business Models in Health Care and a Stronger Role for Insurance Regulators in Containing Health Care Costs*, 41 NOVA L. REV. 313, 315 (2017).

We have previously noted that agreements between willing providers and willing insurers can yield reasonable rates. *See Haygood*, 356 S.W.3d at 393–94. Insurance companies, which insure consumers across the nation, regularly negotiate with providers to agree upon the actual

prices.  *See id.* at 393; Williams, *supra* at 315.  Moreover, insurance companies keep records and databases of both the list prices and the actual prices of specific treatments and procedures, though they may not pass this information to consumers.  *See* Peters, *supra* at 375 (noting as examples that Blue Cross and Blue Shield of North Carolina provides the low, high, and average retail prices of specific procedures on its website, and that Aetna initiated a controversial pilot program in 2005 making information on the actual price for common procedures available to its insureds).  Thus, with national and regional bases on which to compare prices actually paid, insurance agents are generally well-suited to determine the reasonableness of medical expenses.

In determining the necessity of medical expenses, it is beyond argument that medical providers—doctors—are in the best position to determine what treatments or procedures and resulting expenses are "necessary."  So of course, ideally, medical providers themselves would testify to the necessity of medical expenses.  However, by drafting section 18.001 to allow either "the person who provided the service" or the "person in charge of records" to testify to reasonableness and necessity, the Legislature has acknowledged and made allowance for the reality that the ideal paradigm does not reflect today's complex health care system.  And, for better or for worse, in the context of our health care system, what is "necessary" is often heavily influenced by insurance companies and by what treatments and procedures they are willing to cover.  Janet L. Dolgin, *Unhealthy Determinations: Controlling "Medical Necessity*," 22 VA. J. SOC. POL'Y & L. 435, 442–43 (2015) (explaining that the insurance industry sits at the center of the delivery and coverage of health care in the United States and occupies "a privileged position in rendering medical necessity determinations—the rationale in terms of which health care is apportioned").

Thus, the plain language of section 18.001 does not limit the proper affiants to medical providers and medical providers' record custodians, and the reality of our health care system does not mandate such a limitation in order to establish the reasonableness and necessity of expenses. By contrast, the dissent's argument would read into the statute that an affidavit must be made by a records custodian "sufficiently trained or experienced in medicine to give competent testimony as to the necessity of treatment and sufficiently familiar with reasonableness of charges in the region or locale in which services were rendered to give competent testimony as to the reasonableness of amounts paid by insurance companies," as well requiring that an affiant be "reasonably connected to the patient" or have "first-hand knowledge of the services rendered." *But see TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen."). These heightened requirements do not appear in the language of the statute, nor do they comport with the Legislature's intent to streamline proof of the reasonableness and necessity of medical expenses. *See Haygood*, 356 S.W.3d at 397.

We note that in this case, McCoy did produce affidavits from the medical providers or the providers' records custodians, which were later rendered insufficient by our decision in *Haygood* because they reflected only the amount billed. *See* 356 S.W 3d at 398–99. If we were to hold that the subrogation agents' affidavits were also insufficient, as the dissent advocates and Dr. Gunn and OGA would have us do, we would in effect render the Legislature's streamlined proof procedure a complicated trap requiring plaintiffs to provide two sets of affidavits: (1) affidavits as to necessity of treatment from medical providers with actual knowledge of the patient's treatment, or their record

40

custodians; and (2) separate affidavits as to reasonableness of paid charges from local or regional insurance agents or someone else with knowledge of customary amounts paid for particular treatments in that particular region. Such an approach would frustrate the Legislature's intent. We reiterate that an affidavit served under section 18.001 is "purely procedural" and does not amount to conclusive evidence of the expenses. *See* TEX. CIV. PRAC. & REM. CODE § 18.001; *Haygood*, 356 S.W.3d at 397–98. The statute "expressly contemplates that the issue can be controverted by affidavit." *Haygood*, 356 S.W.3d at 397; *accord.* TEX. CIV. PRAC. & REM. CODE § 18.001. We hold that the affidavits served by McCoy were proper and constituted legally sufficient evidence of the reasonableness and necessity of Shannon's past medical fees.

## V. Jury Instruction

At trial, Dr. Gunn and OGA requested the following instruction, which the trial court refused: "An occurrence may be an 'unavoidable accident,' that is, an event not proximately caused by the negligence of any party to the occurrence." They now argue that the trial court committed harmful error by refusing to include their requested instruction in the jury charge. A trial court has considerable discretion to determine proper jury instructions, and we review a trial court's decision to submit or refuse a particular instruction for an abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). One way in which a trial court may abuse its discretion is by failing to follow guiding rules and principles. *Hawley*, 284 S.W.3d at 856. An instruction is proper if it assists the jury, accurately states the law, and finds support in the pleadings and evidence. *Id.* at 855. Still, we do not reverse a judgment based on charge error unless the error probably caused the rendition of an improper judgment or prevented the petitioner from properly presenting the case to the appellate

41

courts. TEX. R. APP. P. 61.1. Thus, when a trial court refuses to submit a requested instruction that is otherwise proper, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam) (citing *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000)).

An unavoidable accident is "an event not proximately caused by the negligence of any party to it." *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995). The purpose of the unavoidable-accident instruction is to advise the jurors that "they do not have to place blame on a party to the suit if the evidence shows that conditions beyond the party's control caused the accident." *Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 432 (Tex. 2005) (citing *Reinhart*, 906 S.W.2d at 472). An instruction on unavoidable accident is "most often used to inquire about the causal effect of some physical condition or circumstance such as fog, snow, sleet, wet or slick pavement, or obstruction of view, or to resolve a case involving a very young child who is legally incapable of negligence." *Reinhart*, 906 S.W.2d at 472. But the instruction is not limited to only those circumstances—it merely informs the jury that it may consider causes of the occurrence other than the negligence of the parties. *Dillard,* 157 S.W.3d at 433. In any case, such an instruction is proper only when there is evidence that the event was proximately caused by a nonhuman condition and not by the negligence of any party to the event. *Hill v. Winn Dixie Tex., Inc.*, 849 S.W.2d 802, 803 (Tex. 1992).

The parties agree that Shannon presented at Woman's Hospital with placental abruption and DIC and that those conditions were not the fault of any party. Dr. Gunn and OGA argue that

Dr. Aubuchon and Dr. Steiner both connected Shannon's brain injury to a non-negligent cause—namely, DIC-induced microthrombi or "little floating clots" that lodged in the small vessels in Shannon's brain and deprived it of blood and the oxygen it carries. Therefore, they argue, the unavoidable-accident instruction would have assisted the jury. *See Dillard*, 157 S.W.3d at 433 ("There is at least a potential implication in [the broad-form jury question] that the occurrence *was* caused by *someone's* negligence. We see no harm in explaining to the jury through an inferential rebuttal instruction that no such implication is intended.") (internal citations omitted).

Indeed, the evidence of causation has been the subject of dispute throughout the pendency of this case. So we have little hesitation in determining that the requested instruction would have been proper.[18] *See Hawley*, 284 S.W.3d at 855 ("An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence."). "The truth is, sometimes accidents are no one's fault, and an unavoidable accident instruction . . . simply explains to the jury that they are not required to find someone at fault." *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006). Be that as it may, however, the decision to refuse a requested instruction remains within the trial court's discretion, and a determination that a requested instruction was proper does not render it mandatory. *Thota*, 366 S.W.3d at 687. We, like the court of appeals, find no authority supporting the conclusion that the trial court in this case erred in refusing to submit an unavoidable-accident instruction. *See* 489 S.W.3d at 115; *see also Towers of*

---

[18] The court of appeals held that the instruction was improper in part because "there was no testimony that Shannon's placental abruption and DIC were 'catastrophic' complications 'predetermined' to result in severe brain damage from the moment she arrived at Woman's." 489 S.W.3d at 115 (quoting *Williams v. Viswanathan*, 64 S.W.3d 624, 629 (Tex. App.—Amarillo 2001, no pet.)). We disagree. Without a full analysis of the plain meaning of "catastrophic" or its place in a post-*Dillard* inquiry, placental abruption and DIC cost this woman her child and possibly her life. *See Dillard*, 157 S.W.3d at 432–34. They were catastrophic.

*Town Lake Condo. Ass'n v. Rouhani*, 296 S.W.3d 290, 301 (Tex. App.—Austin 2009, pet. denied) ("Significantly, though, while the supreme court has held that the trial court may, in its discretion, submit the instruction under such circumstances, it has not held that it is an abuse of discretion not to do so.").

Even assuming the trial court abused its discretion in refusing to submit a jury instruction on unavoidable accident, we conclude that Dr. Gunn and OGA failed to show that the omission probably caused the rendition of an improper judgment.[19] When a trial court errs in refusing to submit an otherwise proper instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Shupe*, 192 S.W.3d at 579. To determine whether the instruction, or the omission of one, probably caused an improper judgment, we examine the entire record. *See Urista*, 211 S.W.3d at 757. We have already discussed both causation theories in depth. Provided with these alternative theories, the jury was free to determine which to credit. *Mel Acres Ranch*, 443 S.W.3d at 833; *City of Keller*, 168 S.W.3d at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony."). Therefore, we assume the jury decided all credibility issues in favor of the verdict if reasonable human beings could do so. *City of Keller*, 168 S.W.3d at 819. In light of the conflicting expert testimony and

---

[19] As a preliminary matter, we reject the court of appeals' conclusion that the "bad result" instruction contained in the first jury question is dispositive of whether the requested instruction was reasonably necessary to enable the jury to render a proper verdict. *See* 489 S.W.3d at 115. The bad-result instruction essentially informed the jury that it could not base its negligence finding solely on a bad result from Shannon's placental abruption and DIC. *Id.* However, this instruction is statutorily required for all health care liability cases. *See* TEX. CIV. PRAC. & REM. CODE § 74.303(e)(2). Thus, the court of appeals' holding would have the effect of rendering an unavoidable-accident instruction unnecessary in all health care liability cases. Moreover, the two instructions deal with different elements of the health care liability suit: a bad-result instruction speaks to the question of negligence, whereas an unavoidable-accident instruction speaks to the element of causation. Therefore, the presence of one instruction does not and cannot render the other unnecessary or irrelevant.

44

because a jury could have reasonably believed Dr. Brewer's blood-loss theory of causation, we conclude that an unavoidable-accident instruction would have merely reiterated the defense's causation theory and therefore was not necessary for the jury to render a proper verdict. *See Thota*, 366 S.W.3d at 695–96 (holding that the trial court's submission of the new and independent cause instruction was harmless error because conflicting expert testimony could have prompted a reasonable jury not to find the defendant negligent, regardless of its conclusion on the question of proximate cause).

## VI. Summary Judgment on Comparative Responsibility

As her fourth issue, Dr. Gunn asserts that the trial court erred in granting McCoy's no-evidence summary judgment motion as to the defendants' affirmative defense of comparative responsibility. However, while the issue was raised in the "Issues Presented" section in both the petition for review and the brief on the merits, Dr. Gunn failed to support her contention with any argument or authority in either the petition or the brief. Every issue presented by a party must be supported by argument and authorities in the party's brief on the merits, or it is waived. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex. 1983); *see also* TEX. R. APP. P. 55.2(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Thus, Dr. Gunn's issue of comparative responsibility is waived.

## VII. OGA's Indemnity Claims

As her fifth issue, Dr. Gunn argues that OGA's indemnity claim will not be ripe unless and until there is a final payable judgment at the conclusion of the appeal. Essentially, she argues that OGA may not pursue inconsistent positions—that Dr. Gunn was not negligent but that OGA is

45

entitled to indemnity from her—simultaneously after the verdict. Generally speaking, "a person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to full indemnity from the other for expenditures properly made to discharge the liability." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 457 (Tex. 2008) (emphasis removed) (quoting *Humana Hosp. Corp. v. Am. Med. Sys., Inc.*, 785 S.W.2d 144, 145 (Tex. 1990)). Of course, we have held that the comparative-negligence statute[20] effectively abolished the common law doctrine of indemnity between joint tortfeasors. *Aviation Office of Am., Inc. v. Alexander & Alexander of Tex., Inc.*, 751 S.W.2d 179, 180 (Tex. 1988). Thus, "[t]he only remaining vestiges of common law indemnity involve purely vicarious liability or the innocent product retailer situation." *Id.* OGA's liability in this case is purely vicarious, and thus it is entitled to bring a cause of action for indemnity against Dr. Gunn.

A cause of action for indemnity accrues when "the indemnitee's liability to the party seeking damages becomes fixed and certain, generally by a judgment." *Am. Star Energy & Minerals Corp. v. Stowers*, 457 S.W.3d 427, 432–33 (Tex. 2015) (citing *Ingersoll–Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 208 (Tex. 1999) (internal quotations omitted)). However, "an indemnitee may bring a claim against an indemnitor before the judgment is assigned against the indemnitee"—before the cause of action accrues and before limitations begin to run. *Id.* Thus, our law does not require that a judgment be fixed and payable on appeal in order to sustain a claim for indemnity. *See, e.g.*, *SSP Partners*, 275 S.W.3d at 457 ("[I]t is a general principle of law that an active *wrongdoer* may

---

[20] Now codified as the "Proportionate Responsibility" statute. *See* TEX. CIV. PRAC. & REM. CODE § 33.001.

be made to indemnify one who has been subjected to, or *is sought to be held liable for*, damage through his *wrong*." (second emphasis added)).

The court of appeals correctly noted that "[Dr.] Gunn has not provided us with, and we have not located, any authority indicating that an indemnity claim only ripens when any related liability appeal is completed." 489 S.W.3d at 117. Instead, Dr. Gunn argues, "If a party seeks inconsistent theories of defense, Texas law does not require it to elect between those theories before verdict, but a party is not entitled to maintain inconsistent positions after the verdict." She cites *International Piping Systems, Ltd. v. M.M. White & Associates, Inc.*, to support this proposition. 831 S.W.2d 444, 452 (Tex. App.—Houston [14th Dist.] 1992, writ denied) ("If a party pleads more than one theory of recovery or defense, normally he need not elect between them until after the verdict."), *disapproved of by Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 950 S.W.2d 371 (Tex. 1997) (per curium). We fail to see how this case supports Dr. Gunn's contention. Even if the case were persuasive, the previous sentence states that "our liberal system of pleading allows a party to state his claims or defenses alternatively or hypothetically and to state as many claims as he has regardless of consistency." *Id.* This is consistent with the Texas Rules of Civil Procedure, which permit a party to set forth alternative claims of defense and says nothing about whether those positions are maintained while a case is pending appeal. TEX. R. CIV. P. 48. We conclude that OGA's common law indemnity claim was ripe for determination when the trial court rendered its judgment against Dr. Gunn notwithstanding the pending appeal.

## VIII. Windfall

As her sixth issue, Dr. Gunn argues that Shannon's death on the eve of the court of appeals' decision created a windfall for McCoy that calls for a remand in the interest of justice. She notes that almost 70% of the trial court's judgment was for future medical expenses, which will now never be incurred. Texas Rule of Appellate Procedure 7.1 speaks to this very situation:

> If a party to a civil case dies after the trial court renders judgment but before the case has been finally disposed of on appeal, the appeal may be perfected, and the appellate court will proceed to adjudicate the appeal as if all parties were alive. The appellate court's judgment will have the same force and effect as if rendered when all parties were living.

TEX. R. APP. P. 7.1. We do not disagree that if this case were remanded to the trial court for a new trial, the issue of future medical expenses would become moot (and the amount of past medical expenses would almost certainly increase); however, that is not the disposition of this case. *Cf. In re Dep't. of Family & Protective Servs.*, 273 S.W.3d 637, 644 (Tex. 2009) (orig. proceeding) ("When a trial court grants a motion for new trial, the case is reinstated on the trial court's docket as though no trial had occurred, and the slate is essentially wiped clean."). We have already determined that liability in this case was established by legally sufficient evidence and that future medical expenses were proven to an ascertainable amount with reasonable certainty. Therefore, we issue our judgment as if Shannon were still alive, as Rule 7.1 requires.

We note that the outcome may well be different had the trial court awarded McCoy periodic payments of future medical expenses. Texas Civil Practice and Remedies Code section 74.506 provides:

48

(a) On the death of the recipient, money damages awarded for loss of future earnings continue to be paid to the estate of the recipient of the award without reduction.

(b) Periodic payments, other than future loss of earnings, terminate on the death of the recipient.

TEX. CIV. PRAC. & REM. CODE § 74.506. When requested by a defendant physician or health care provider, a trial court must order that medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments. *Id.* § 74.503(a). When periodic payments are ordered, the court must make specific findings as to the amount of periodic payments, and the court's judgment must specify the amount, the timing of payments, and the number of payments or time period over which payments are to be made. *Id.* § 74.503(c), (d). The trial court's judgment in this case awarded McCoy future medical expenses as a lump-sum payment, and there is nothing in the record to indicate that Dr. Gunn or OGA requested periodic payments. Had the future medical expenses been awarded as periodic payments, any remaining payments would have terminated upon Shannon's death. *See St. Joseph Reg'l Health Ctr. v. Hopkins*, 393 S.W.3d 885, 886 (Tex. App.—Waco 2012, pet. denied) (recognizing that the death of a recipient of periodic payments of future medical expenses would terminate such payments). But pursuant to Rule 7.1, we review and adjudicate the lump-sum award of future medical expenses as if Shannon were still alive.

Besides that, we are hardly persuaded by the argument that McCoy received a windfall merely because Shannon's actual life span was shorter than her projected life span. While evidence must establish a reasonable probability of future medical expenses in order to support an award, such an award, by its nature, evades certainty. *See Harriett*, 15 S.W. at 559; *Rosenboom Mach. & Tool,*

49

*Inc.*, 995 S.W.2d at 828. Dr. Willingham projected and Dr. Schilling did not contest that Shannon's future medical expenses were based on a twenty-year life expectancy. And Shannon could have outlived that expectancy, in which case the judgment would have been for less than she needed. Further, based on Dr. Willingham's testimony, the jury clearly considered the possibility that Shannon's life expectancy would end up not being accurate:

> Q: So if she lives for one year longer than you're forecasting, she is going to run out of money, isn't she?

> A: And this would understate her need, that's correct.

But of course, we would not go back and adjust the judgment upwards if she had outlived Dr. Willingham's projection. Similarly, we do not vacate a judgment for future medical expenses simply because a party died earlier than projected. *Cf. Gibbs v. Belcher*, 30 Tex. 79, 84–85 (Tex. 1867) (concluding that the death of the party after judgment did not have the effect of vacating or opening the judgment). We decline to remand this case based solely on Shannon's premature death.

## IX. Conclusion

We hold that: (1) the evidence is legally sufficient to support causation; (2) although the trial court erred in excluding the video deposition testimony of Dr. Schilling, the exclusion did not probably cause the rendition of an improper verdict; (3) Texas Civil Practice and Remedies Code section 18.001 does not limit the proper affiants to medical providers and medical providers' record custodians; therefore, the affidavits served by McCoy were proper and constituted legally sufficient evidence of the reasonableness and necessity of Shannon's past medical expenses; (4) Dr. Gunn and

50

OGA failed to show that the trial court committed harmful error in refusing the requested instruction on unavoidable accident; (5) Dr. Gunn waived her challenge to the no-evidence summary judgment on comparative responsibility; (6) OGA's indemnity claim was ripe when the trial court rendered its judgment against Dr. Gunn; and (7) Shannon's death does not mandate a remand of the case. For the reasons expressed, we affirm the judgment of the court of appeals in its entirety.

_____

Paul W. Green
Justice

OPINION DELIVERED: June 15, 2018

51